J^McDONALD, J.
The defendant, Anthony Black, was charged by bill of information with manslaughter, a violation of La. R.S. 14:31. Defendant entered a plea of not guilty and was tried before a jury. The jury found the defendant guilty as charged. The trial court sentenced the defendant to a term of twenty-five years at hard labor to run concurrent with any other sentences that defendant was serving. The defendant appeals, citing three assignments of error. After reviewing the record, we find the defendant’s assigned errors have no merit and affirm his conviction and sentence.
FACTS
MacArthur Franklin, the victim, lived with Alice Black at a residence located at 4013 Pensacola Drive in Baton Rouge, Louisiana. The victim and Ms. Black had been in a relationship since 1995, despite Ms. Black still being legally married to defendant.[1] Ms. Black and defendant had two children born of their marriage, Shannon Davis and Crystal Davis. Ms. Black and the victim had one child born of their relationship, Desmond Black, who was three years old at the time of these events. Ms. Black also had an older son, Jeremy Davis, whose father was Donald George.
On October 28, 2001, the victim arrived at the residence and found sixteen year-old Crystal at home with two boys. This was in violation of a household rule that no guests were allowed when the adults were gone. The victim became angry with Crystal and removed the two boys from the house. The victim called Ms. Black at work to tell her what had happened. Ms. Black arrived home at her house at approximately 7:30 p.m. and saw Crystal outside across the street. Ms. Black went inside to speak with the victim, [3who told her that he did not want Crystal living in the house anymore. Crystal entered the house and spoke with her mother, who informed her that she had to leave. Crystal and the victim began to argue. The confrontation turned physical when Crystal retrieved a butcher knife from the kitchen and the victim armed himself with a chair. Following her mother’s instruction, Crystal put down the knife. During the argument, Crystal sustained a busted lip. Ms. Black thought this injury resulted from the victim swinging the chair at Crystal. Crystal ran out of the house, followed by the victim, who continued arguing with her. Ms. Black returned to the house to check on her son, Desmond, who was upset. Despite Ms. Black’s urgings, the victim refused to go inside the house. A short time later, Ms. Black went outside again to find that her twenty-two year-old son, Jeremy, had arrived and was arguing with the victim.
According to Jeremy, he was driving by his mother’s house and had been flagged down by two guys and a girl in front of the house. He was told that Crystal was crying. Jeremy claimed he told Crystal to get her clothes and leave with him, and then he walked down the street. Jeremy also claimed to have witnessed some type of confrontation between Crystal and the victim inside the house where he saw the victim strike Crystal in the mouth. Out of concern for his half-sister, Jeremy returned to the carport. The victim began chasing Jeremy and his friend, Rodriek *147 Bell, with a knife and a broomstick handle. Jeremy said the victim fell while chasing him. Jeremy instructed his cousin, Erica, who was present during the confrontation, to bring his car to him down the street when Crystal was ready to leave.
As Erica went to get into Jeremy’s car, the victim was seen standing over her, holding a knife to her chest before Ms. Black pleaded with him to | ¿return inside the house. Crystal, Jeremy, Erica, and Rodrick all left, taking Crystal to the home of her father, the defendant.
The victim left his house and took his son, Desmond to the store with him. When he returned, the victim called the police. The police stayed approximately thirty to forty-five minutes. According to Ms. Black, the victim and Jeremy had an ongoing dispute. Ms. Black said the victim told her he called the police because he wanted to have an alibi if he had to kill one of the kids. Ms. Black also heard the victim tell the police that Jeremy had hit him, that he wanted Jeremy to go to jail, and that he did not want Jeremy in his house.
In the meantime, Crystal arrived at the home of her father, the defendant. She told him what had happened, and stated that she wanted to live with him. Crystal also told defendant that she needed him to go with her to get her clothes, because earlier when she was trying to get her clothing the victim had hit her. At defendant’s insistence, Crystal obtained permission for the two of them to return to the house to pick up her clothing. The defendant, Crystal, Jeremy, Erica, and Rodrick all got into Jeremy’s car and returned to the victim’s house shortly before 10:00 p.m. This was approximately two hours after the initial confrontation.
Despite having permission to retrieve her clothing, Crystal entered the home through her bedroom window. After the defendant witnessed his daughter climbing through her bedroom window, he became concerned, exited the car and rang the doorbell. When the doorbell rang, Crystal emerged from her bedroom with her clothes packed and went to the door. This was the first indication to Ms. Black that her daughter had returned to the house. When Crystal opened the door, the defendant entered the home, walked just past the doorway and calmly asked the victim, who was sitting | ¡¡across the living room with his son, Desmond, on his lap, what the problem was between the victim and Crystal. According to Ms. Black, the knife and broomstick handle brandished during the prior confrontations were both on the side of the chair where the victim was seated. The victim became agitated, cursed, and said there was a problem between them and told defendant and Crystal to get out. Defendant merely responded, “Okay.”
At that point Jeremy entered the home and walked to a point in the living room between defendant and the victim and began arguing with the victim. This confrontation turned physical. Ms. Black went toward the defendant because she could tell he had a gun in his waistband, but he pushed her aside, pulled out the gun and fired a warning shot into the ceiling. The victim and Jeremy both fell, and defendant shot the victim twice. Defendant was heard saying he thought he should stay until the police arrived, but Crystal was pleading with him to leave, so he left. Approximately forty minutes later, the defendant turned himself in to the police. The gun was never recovered and the defendant did not testify on his own behalf at trial.
SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, defendant argues that the evidence pre *148 sented was insufficient to support his conviction for manslaughter because the State failed to negate his theory that the victim was shot in self-defense and/or defense of another, namely, Jeremy Davis.
The standard of review for the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); La.C.Cr.P. art. 821. This standard of review, in particular the requirement that the evidence be viewed in the light most favorable to the prosecution, obliges the reviewing court to defer to the actual trier of fact’s rational credibility calls, evidence weighing, and inference drawing. The reviewing court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder’s determination of guilt. State v. Corkern, 2003-1393, p. 2-3 (La.App. 1st Cir.9/17/04), 897 So.2d 57.
Pursuant to La. R.S. 14:31(A)(1), manslaughter is defined in pertinent part as follows:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
When a defendant claims self-defense in a homicide case, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Fisher, 95-0430, p. 3 (La.App. 1st Cir.5/10/96), 673 So.2d 721, 723, writ denied, 96-1412 (La.11/1/96), 681 So.2d 1259. A homicide is justifiable only when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(1); State v. Lilly, 552 So.2d 1036, 1039 (La.App. 1st Cir.1989). It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person. La. R.S. 14:22.
17However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21. For appellate purposes, the standard of review of a claim of self-defense is whether a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Lilly, 552 So.2d at 1039.
Defendant argues that when he shot the victim, he was defending himself and also his stepson, Jeremy. In brief, defendant argues that he was aware of the confrontations and fights that had occurred earlier that day. These included the confrontation between the victim and Crystal that resulted in Crystal’s lip being busted; the victim chasing the teenagers around his carport with a knife and broomstick han- *149 die; the victim threatening Erica by holding a knife to her chest as she attempted to back a car out of the driveway; and the victim’s confrontation with Jeremy. According to defendant, he had been led to believe that the victim had calmed down before he went over to the victim’s house, but once he and Jeremy arrived at the home, the victim again flew into a rage and attacked them.
The evidence presented regarding the events surrounding the shooting is as follows: Ms. Black knew Crystal was coming over to get her clothes and knew the defendant was with Crystal because Crystal had called to get permission to retrieve her clothing and to say she was going to live with defendant. Ms. Black testified that the victim was sitting in his living room with Desmond, his three-year old son, on his lap. Ms. Black heard the Isdoorbell ring, and then saw Crystal emerge from the back of the house with all her clothing packed. Crystal opened the front door, and the defendant was standing there.
After Crystal opened the door, the defendant entered the house about a foot past the doorway. According to Ms. Black, the defendant calmly asked the victim what the problem was between the victim and Crystal. The victim then got agitated, said he had a problem with Crystal, and told them to get out. Defendant simply responded, “Okay.”
Ms. Black testified that things escalated immediately after Jeremy entered the house and positioned himself between the defendant and the victim. The victim and Jeremy immediately began arguing, then physically fighting. Ms. Black never saw the victim pick up a knife, but she said she moved toward the defendant because she knew the victim would not listen to her. Ms. Black could tell the defendant had a gun in his waistband, and as she got closer to the defendant, he raised his shirt to indicate he had a gun.
Ms. Black grabbed the defendant as he pulled the gun from his waistband. The defendant fired a shot into the wall and then pushed Ms. Black to the floor. Ms. Black heard a second shot being fired and she saw the victim on his knees as he held onto the defendant. Then the victim fell to the floor. Ms. Black heard three shots fired altogether.
Crystal denied that the victim hit her during their argument in the kitchen and denied that the victim forcing her friends to leave the house was the subject of her argument with him. Crystal testified that she told the defendant about everything that happened that day and that she needed him to go with her to get her clothes because earlier that day, when she was trying to get her clothes, the victim hit her. Crystal testified that she called her mother and obtained permission for herself and defendant to go back to | spick up her clothes and that she, the defendant, Jeremy, Erica, and Rodrick all went to the victim’s house in Jeremy’s car. Although she had gotten permission to get her clothing, Crystal testified that she entered the house through her bedroom window because she did not want to go through the living room where the victim was seated. However, Crystal admitted that when the doorbell rang, she went back through the living room to answer it.
According to Crystal, the defendant rang the doorbell, then stood in the threshold, and calmly asked the victim what the problem was. Crystal stated there was no confrontation until Jeremy entered the room a few seconds later and the victim began arguing with Jeremy. According to Crystal, Jeremy ran toward the victim, who had a knife and a stick in his hands. The victim picked up Jeremy and was running with him towards defendant. Jer *150 emy then bit the victim on the forehead. Crystal testified that the victim pushed Jeremy to the ground, then went after the defendant with the knife and stick in his hands, but stumbled over Jeremy as he charged towards the defendant.
Crystal claims at this point she heard two shots fired. After the shots were fired, both the victim and Jeremy were on the ground. Crystal said her father wanted to remain at the scene, but she begged him to leave, so they left.
Jeremy’s testimony was consistent with his mother and half-sister’s testimony in that he said Crystal called her mother and obtained permission to go over and get her clothes. Jeremy testified he drove himself, Crystal, the defendant and two others over to the victim’s house, but he parked three houses away. Jeremy explained that he felt safer parking there rather than in the driveway. Jeremy testified that he and the defendant watched Crystal enter the house through the bedroom window and that the defendant became Imconcerned because of this and got out of the car and walked over to the house. Jeremy followed the defendant a short time later. Jeremy watched as the defendant rang the doorbell and entered the house just past the doorway. Jeremy then followed the defendant into the house and walked past the defendant into the living room. Once Jeremy entered the house, the victim jumped to his feet and charged at him with a knife and a stick in his hand. Jeremy tried to grab the victim by the arm, but the victim knocked him down. Jeremy further testified that he grabbed the victim so he could not use the hand with the knife and he bit the victim on the forehead. Jeremy said the victim knocked him down, then he heard a shot and they both fell to the ground. Then Jeremy heard another shot. According to Jeremy, the victim grabbed the defendant by the jacket right before the second shot was fired. Jeremy testified that he did not receive any injuries from the fight with the victim.
Lieutenant Terry Felton, with the East Baton Rouge Parish Sheriffs Office, participated in the investigation of this matter. According to Lt. Felton, the police found a broomstick handle in the living room where the victim’s body was, but did not find a knife. A butcher knife was recovered on the floor of the master bedroom in front of the nightstand. According to Lt. Felton, Ms. Black told the officers the knife did not have anything to do with what had happened in the house.
Dr. Michael Cramer, a consultant to the East Baton Rouge Parish Coroner, was accepted as an expert in forensic pathology. Dr. Cramer performed the autopsy on the victim. Dr. Cramer testified that the victim died as a result of bleeding to death from two gunshot wounds. Dr. Cramer also noted that the victim had a bite mark on his forehead close to his |T ^airline, some abrasions on the bridge of his nose and forehead, a small laceration to the right side of his eyebrow and a bruise on his back.
Dr. Cramer testified that one of the gunshot wounds the victim received was in the middle of his chest. This wound had punctuate lesions caused by unburnt powder that impacted on the victim’s skin, which is referred to as tattooing or stippling, which commonly occurs when a gun is fired one to two feet away from the body. Dr. Cramer noted that the bullet that entered the victim’s chest passed through his heart and exited in a downward, slightly right to left trajectory. Because the victim was 6'4" and defendant was 5'6", Dr. Cramer opined that the victim was in a lower position than defendant when the shot was fired.
*151 Dr. Cramer also noted the presence of a second gunshot wound where the bullet entered the victim’s upper right arm, passed through the armpit, reentered the body, and wound up in the left lumbar area. Dr. Cramer opined that for the bullet to take the path that it did, the victim may have been in a lower position than the defendant, with the victim holding his arm up. Dr. Cramer indicated that the bullet that entered the victim’s arm was likely the first one that entered the victim’s body.
It is evident that the jury was presented with conflicting accounts of what happened when the defendant, Crystal, and Jeremy showed up at the house to get Crystal’s clothing. It is well settled that the trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight of the evidence, not its sufficiency. The reviewing court must defer to the actual trier of fact’s rational Incredibility calls, evidence weighing, and inference drawing. State v. Fisher, 95-0430 at pp. 4-5, 673 So.2d at 724.
The jury was presented with conflicting accounts of whether the victim was armed with a knife when he was in the living room. However, what is consistent in all the testimony of the people who were in the room is the argument did not escalate into a physical confrontation until Jeremy entered the living room. Given the previous events and confrontations that took place between Jeremy and the victim, the jury could have concluded that Jeremy’s entry into the living room placed him in the role of the aggressor. Although Crystal and defendant had permission to enter the house to retrieve her clothing, Jeremy did not, and the evidence indicated that the victim specifically did not want Jeremy in the house. Although Jeremy claimed the victim attacked him, he did not have any injuries, yet, the victim, who was physically bigger than Jeremy, received a bite mark on his forehead.
Further, the defendant claims he shot the victim in self-defense and in defense of his stepson, yet the medical testimony indicates that the victim was in a lower, defensive position when he was shot. Even Jeremy testified that defendant shot the victim after he had stumbled.
In this case, the jurors obviously rejected the defendant’s claims of self-defense and defense of another. The jury could have applied the aggressor doctrine, since a physical confrontation immediately resumed once Jeremy returned to the house. If the jury found Jeremy was the aggressor, it would prevent the defendant from being able to use defense of Jeremy as a reason to use deadly force against the victim since it would have been Jeremy who sparked the physical confrontation. It is also possible that the jury could have determined that the defendant did not believe that he was in 11simxninent danger of losing his life or receiving great bodily harm at the time he shot the victim, and that the defendant’s actions were not reasonable under the circumstances. The record, when viewing the evidence in the light most favorable to the prosecution, reasonably supports either of these conclusions.
Viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could have found all the essential elements of manslaughter and found that the defendant did not shoot the victim in self-defense or the defense of another. This assignment of error is without merit.
*152 EVIDENCE OF VICTIM’S CHARACTER
In his second assignment of error, defendant argues that the trial court erred in excluding testimony by Jeremy that several years earlier the victim had stabbed him with a knife. The trial court granted the State’s motion in limine restricting Jeremy’s testimony as to any prior bad acts on the part of the victim against him, finding such evidence irrelevant to the state of mind of defendant.
The defendant argues in brief that this was error because he was aware of the incident concerning the victim and Jeremy due to the fact he was Jeremy’s stepfather and had raised him. The defendant further argues that the incident described by Jeremy is similar to what occurred in the present case thereby making the defendant aware that the victim would actually use the knife under the circumstances that were unfolding.
Evidence of a person’s character generally is not admissible to prove that the person acted in conformity with his or her character on a particular occasion. La. C.E. art. 404(A). However, there are several specific exceptions to this general rule. With respect to evidence of the dangerous | ucharacter of the victim of a crime, such evidence is admissible (1) when the accused offers appreciable evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, or (2) when the accused, relying on the defense of self-defense, establishes (a) a history of assaultive behavior between the victim and the accused and (b) a familial or intimate relationship between the victim and the accused. See La. C.E. art. 404(A)(2). The domestic violence exception is not applicable in this case. Thus, in order to introduce any evidence regarding the victim’s character, it had to first be shown that the victim made some hostile demonstration or overt act at the time of the offense charged. The term “overt act,” as used in connection with prosecutions where the plea of self-defense is involved, means any act of the victim that manifests to the mind of a reasonable person a present intention on his part to kill or do great bodily harm. State v. Loston, 2003-0977, pp. 11-12 (La.App. 1st Cir.2/23/04), 874 So.2d 197, 205-06, writ denied, 2004-0792 (La.9/24/04), 882 So.2d 1167.
In this case, there is no evidence to indicate the victim initiated a physical confrontation with the defendant. The evidence indicates the victim charged after Jeremy, upon Jeremy’s entry into the victim’s home. Despite the conflicting testimony whether the victim held a knife, the testimony established that the victim did hold a broomstick handle and was physically bigger than Jeremy. This could have suggested to a reasonable man that the victim had the intent to kill or inflict great bodily harm on Jeremy, but not the defendant.
Moreover, even where a proper foundation is laid, the admissibility of a victim’s character trait depends on the purpose for which the evidence is offered. Once evidence of an overt act on the part of the victim has been presented, evidence of threats and of the victim’s dangerous character is Inadmissible for two distinct purposes: (1) to show the defendant’s reasonable apprehension of danger which would justify the conduct; and (2) to help determine who was the aggressor in the conflict. Only evidence of general reputation and not specific acts, is admissible in order to show who the aggressor was in the conflict. Evidence of prior specific acts of the victim against a third party is inadmissible for this purpose. When evidence of a victim’s dangerous character is offered to explain defendant’s reasonable *153 apprehension of danger, such evidence may be introduced to show the accused’s state of mind only if it is shown that the accused knew of the victim’s reputation at the time of the offense. When such a showing is made, some courts have held that evidence is not limited to general reputation, but may also include evidence of specific acts. Other courts have held that, even when offered for this purpose, only specific acts committed against the defendant are admissible. State v. Loston, 2003-0977 at pp. 13-14, 874 So.2d at 206-07.
In the present case, Jeremy testified during the motion in limine that he had a confrontation with the victim in January 1998, wherein the victim attempted to stab him, but Jeremy was able to grab the knife and only sustained an injury to his hand. Jeremy specifically denied the 1998 incident had any relevance to the present case. Further, there was no showing made that defendant was aware of the victim’s criminal record or the prior specific incident from 1998 of alleged victim aggression sought to be introduced. Merely establishing that defendant was the stepfather of Jeremy does not equate to defendant having knowledge of all of Jeremy’s activities. Accordingly, the trial judge did not err in excluding evidence of the victim’s criminal record and specific acts of violence against a third person, offered for the purpose of explaining defendant’s state of mind.
lifiThis assignment of error is without merit.
EXCESSIVE SENTENCE
In his third assignment of error, defendant argues that his sentence is excessive under the circumstances of this case. The penalty provision for manslaughter provides for a term of imprisonment at hard labor for not more than forty years. La. R.S. 14:31(B). The trial court sentenced defendant to a term of twenty-five years at hard labor.
The Code of Criminal Procedure sets forth items that must be considered by the trial court before imposing sentence. La.C.Cr.P. art. 894.1. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App. 1st Cir.), writ denied, 565 So.2d 942. (La.1990). In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court’s stated reasons and factual basis for its sentencing decision. State v. Lewis, 489 So.2d 1055, 1061 (La.App. 1st Cir.), writ denied, 493 So.2d 1218 (La.1986).
The trial court has wide discretion, although not unbridled, in the imposition of a sentence within statutory limits. See State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Article I, section 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. A sentence will be determined to be excessive if it is grossly disproportionate to the crime, or is nothing more than the needless imposition of pain and suffering. The determination turns upon the punishment and the crime in light of the harm to society and whether or not the penalty is so disproportionate that it shocks our sense of justice. State v. Waguespack, 589 So.2d 1079, 1086 (La.App. 1st Cir.1991), writ denied, 596 So.2d 209 (La.1992).
|17A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. Id. A sentence imposed within the statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. *154 Latiolais, 563 So.2d 469, 473 (La.App. 1st Cir.1990).
At the sentencing hearing, the trial court stated that it had reviewed the pre-sentence investigation report (PSI) and the sentencing guidelines set forth in the Code of Criminal Procedure. Although the defendant had no prior felony convictions, the trial court noted he had six juvenile dispositions, twenty-three arrests, and five misdemeanor convictions. The trial court also indicated that it considered the victim impact statements.
As noted above, the maximum sentence that the defendant could have received was forty years at hard labor. La. R.S. 14:31(B). Although defendant argues he was acting as a concerned father against an aggressive victim, the jury rejected the theory of justification. The record indicates defendant created a risk of death or great bodily harm to everyone in the house when he fired a warning shot into a wall and by shooting the victim twice as he was fighting with the defendant’s stepson. Moreover, the defendant shot the victim in the presence of the victim’s three-year-old son. After considering the circumstances of the present offense, we find no abuse of discretion by the trial court in sentencing defendant to twenty-five years at hard labor.
This assignment of error is without merit.
CONCLUSION
Therefore, for the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.

. Ms. Black had filed a petition for divorce seeking dissolution of her marriage to the defendant prior to starting a relationship with the victim.